IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

BLAKE WILSON, #Y56864,           )
                                 )
          Plaintiff,             )
                                 )
v.                               )          Case No. 3:23-cv-04066-RJD
                                 )
ANTHONY WILLS, *et al.*,         )
                                 )
          Defendants.            )

## ORDER

**DALY, Magistrate Judge:**[1]

This matter comes before the Court on Defendants' Motion for Summary Judgment on the Issue of Exhaustion of Administrative Remedies (Doc. 79) and Plaintiff's Motion to Appoint Counsel (Doc. 96). For the reasons set forth below, Defendants' Motion for Summary Judgment on the Issue of Exhaustion of Administrative Remedies (Doc. 79) is **DENIED** with respect to the claims against Defendants Lewey (Count 1), J. Smith (Count 4), and Bent (Count 5) and **DENIED without prejudice** as to the claims against Defendants' Bent, Modglin, Robert, Effenger, and Leposky (Count 3) and against Defendant Mercer (Count 4). Plaintiff's Motion to Appoint Counsel (Doc. 96) is also **DENIED without prejudice**.

## Background

Plaintiff Blake Wilson, an inmate of the Illinois Department of Corrections (IDOC) who is currently incarcerated at Lawrence Correctional Center, brought this civil action pursuant to 42

---

[1] This matter has been assigned to the undersigned to conduct any and all proceedings, including trial and final entry of judgment, through the parties' full consent pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73. (Doc. 69).

U.S.C. § 1983 for violations of his constitutional rights while at Menard Correctional Center (Menard). (Doc. 1; Doc. 8, pp. 1-2). Plaintiff was transferred to Menard on January 24, 2023, and remained there until February 4, 2025. (Doc. 71).

In his Complaint, filed on December 29, 2023, Plaintiff alleged that on June 13, 2023, some inmates in the East Housing Unit at Menard began throwing feces and urine and burning clothing in response to the water in their cells being shut off. (Doc. 8, p. 2; Doc. 1, p. 2). The tactical team came to Plaintiff's cell, wrongfully believing that he had participated in starting fires, and they sprayed mace at Plaintiff and his cellmate. Plaintiff was placed in handcuffs and forced to the ground. The officers, including Correctional Officer Lewey, then beat him. Plaintiff alleged that, thereafter, Lewey falsely claimed that Plaintiff struck him with a property box and caused his hand to fracture. As a result, Plaintiff was allegedly issued a disciplinary report and was sentenced to one year and 28 days in segregation.

On September 16, 2023, while in segregation, Plaintiff splashed a rival gang member with spoiled milk, and the milk splashed on Correctional Officer A. Smith, who was the shower escort. (Doc. 8, p. 2; Doc. 1, p. 3). Correctional Officers Robert and Effenger took Plaintiff to see a nurse and told Plaintiff to tell her he was fine. After doing so, Plaintiff was beaten by Correctional Officers Robert, Effenger, Bent, Modglin, and Sergeant Leposky. The officers choked, punched, hit, and kneed Plaintiff. He was hit on the back with a clipboard and dragged off the ground by his hair. After the incident, Lieutenant Mercer falsified a mental health form in order to have Plaintiff placed in watch cell 5-04, where he knew Plaintiff would endure unconstitutional conditions until September 30, 2023. Plaintiff alleges that for a number of days, he was without running water, a mattress, and food. He was harassed by Lewey, and when A. Smith was working, Plaintiff was not allowed to shower. Bent also delayed Plaintiff's mail. On November 13, 2023,

Correctional Officer J. Smith gave Plaintiff a food tray that was contaminated with a mucus-like

substance.  (*Id.*).  After the threshold review of the Complaint, Plaintiff was allowed to proceed on

the following claims:

| | |
|---|---|
| **Count 1:** | Eighth Amendment claim against Correctional Officer Lewey for the use of excessive force against Plaintiff on June 13, 2023. |
| **Count 3:** | Eighth Amendment claim against Bent, Modglin, Robert, Effenger, and Leposky for the use of excessive force against Plaintiff on September 16, 2023. |
| **Count 4:** | Eighth Amendment claim of cruel and unusual punishment against the following Defendants: (a) Mercer for intentionally falsifying a mental health form, resulting in Plaintiff being placed in watch cell 5-04 for fourteen days (September 16, 2023, through September 30, 2023), where he was denied running water, not provided a mattress, and denied food; and (b) J. Smith for intentionally contaminating Plaintiff's kosher breakfast tray on November 13, 2023. |
| **Count 5:** | First Amendment claim against Bent for repeatedly delaying Plaintiff's mail while he was housed in cell 2-44. |

(Doc. 8, pp. 4-10).[2]

On March 24, 2025, Defendants filed their motion for summary judgment on the issue of

exhaustion of administrative remedies.  (Doc. 79).  They argued that Plaintiff submitted 11

grievances to the Administrative Review Board (ARB) regarding his incarceration at Menard, all

of which were denied due to procedural deficiencies.  Plaintiff filed a response and a supplemental

response along with exhibits.  (Docs. 87, 88 & 89).[3]  Plaintiff countered that the administrative

---

[2] All claims against Defendants Murphy, Royster, Schoebeck, A. Smith, John Doe 3, John Doe 4, John Doe 5, and Tact Team John Does were dismissed without prejudice for failure to state a claim.  (Doc. 8, p. 10). On July 17, 2014, Correctional Officer Effenger was substituted for John Doe 1, and Correctional Officer Bent was substituted for Correctional Officer Bennett.  (Doc. 24).  On August 13, 2024, Defendant "Rob" was identified as Dalton Robert, and Defendant "Lightfoot" as Kenneth Modglin.  (Doc. 37).  On January 22, 2025, Nicholas Mercer was substituted for John Doe 2.
[3] Plaintiff filed a motion asking the Court to accept his previously stricken filing titled  "Exhaustion of Administrative Remedies" as his response to Defendants' motion, which the Court granted.  (Docs. 84, 85, 87).

remedies were unavailable to him due to harassment and intimidation by Menard correctional officers, as well as because the grievance process at Menard never provided any relief to inmates. He pointed to an emergency grievance he filed regarding Count 4 of the Complaint, and which the Menard Chief Administrative Officer ("CAO") deemed an emergency on or about November 2023, but the Menard Grievance Officer failed to address it for nearly two years. (Doc. 87, p. 2).[4] In his supplemental response, Plaintiff restated his fear of filing grievances due to retaliation. (Doc. 88. p. 1). He claimed that instead of filing grievances, he initiated an internal affairs investigation, he contacted the Illinois State Police, who refused to conduct an investigation, and further contacted the Governor's office. (*Id.*). Plaintiff attached to his response all relevant grievances he filed regarding this case, including grievances that were not submitted to the ARB and which were not produced by the Defendants, as well as correspondence of his attempts to receive relief from outside Menard. (Doc. 87, pp. 4-126).

***Pavey Hearing***

An evidentiary hearing pursuant to *Pavey v. Conley*, 544 F.3d 739 (7th Cir. 2008) was held on April 29, 2025. (Doc. 94). Plaintiff's testimony focused on his attempts to exhaust his administrative remedies and seek relief inside and outside Menard. Plaintiff did not dispute that none of his grievances were fully exhausted prior to the filing of his Complaint. He argued, however, that the administrative remedies were rendered unavailable on several grounds.

First, Plaintiff pointed to a grievance he filed on November 30, 2023, regarding Defendant Jeremy Smith placing a mucous substance in his breakfast tray, for which he did not receive a response for two years.[5] Plaintiff further explained that following the June 13, 2023, altercation

---

[4] It appears that Plaintiff referred to Grievance K5-1223-1861, dated November 30, 2023. (Doc. 89, pp. 2-5).

[5] Based on his filings, this is Grievance K5-1223-1861, dated November 30, 2023. (Doc. 89, pp. 2-5).

with Defendant Lewey, Plaintiff was transferred to the third floor of the Menard Health Care Unit for approximately 63 days. Upon his transfer there, Plaintiff drafted a grievance regarding the June 13, 2023, incident and Officer Lewey's alleged misconduct and sent it directly to the ARB. Following the filing of that grievance, Plaintiff testified that he began to receive threats from two correctional officers who are not parties in this suit. The officers passed several times by the health care unit where Plaintiff was hospitalized, called him a "snitch bitch" and asked whether he was "ready for round two." Plaintiff testified that he perceived those comments as a direct threat to him for his grievance activity. He testified that he did not file any other grievance during his stay at the Health Care Unit, between July and early August of 2023, because he was afraid. Following his discharge from the Health Care Unit, Plaintiff continued to be threatened sporadically by a non-party correctional officer named "Choate." Correctional Officer Choate made homosexual remarks against Plaintiff.

Plaintiff testified that on September 16, 2023, he was attacked by Defendants Bent, Modglin, Robert, Effenger, and Leposky, but he did not file any grievance out of fear of retaliation. Instead, Plaintiff testified that he reached out to outside institutions to obtain relief. Specifically, Plaintiff sent a letter to the Illinois State Police seeking an investigation of Menard Staff's alleged assault against him on September 16, 2023. Plaintiff further attempted to initiate a petition for a protective order with the Randolph County Circuit Court against certain Menard correctional officers, including some Defendants, but his petition was never actually filed due to procedural deficiencies. (*see also* Do c. 87, p. 58). Plaintiff also testified that he filed a PREA complaint through the John Howard Association for Choate's use of derogatory language.[6] He also attempted

---

[6] Plaintiff did not testify on the dates he filed the PREA Complaint or the results of any investigation. He provided, however, a response by the John Howard Association, dated February 28, 2024, acknowledging receipt of his PREA report and advising that it had been forwarded to the IDOC. (Doc. 87, pp. 7-8).

to seek a protective order in Cook County against all Defendants, but that filing also failed.[7] Plaintiff further explained that he did not talk to his Counselor about his fear of filing a grievance because the Counselor was always accompanied by a correctional officer.

Plaintiff testified that he resumed filing grievances to the ARB after the November 13, 2023, incident with Defendant J. Smith because he realized that refraining from doing so would not protect him from harassment.  Plaintiff also filed grievances at the facility level after he filed the Complaint, because Defendants had become aware of his claims against them by then.

Asked about his understanding of the grievance process, Plaintiff testified that he was transferred directly from segregation at Shawnee Correction Center (Shawnee) to segregation at Menard and was thereafter released to the Menard general population.  He testified that he never received an orientation or instructions on how to file a grievance since his transfer there.  He testified that, based on his prior experience at Shawnee and Jacksonville Correctional Center (Jacksonville), he believed that the crucial step in exhausting his administrative remedies was to obtain a stamped copy of his grievance from the ARB.  However, he explained that he did not know the proper steps, timeline, or deadlines for fully exhausting a grievance while at Menard. He originally believed that as long as he received some response from the ARB, he could proceed with filing a complaint.  Plaintiff explained that he was sending his grievances directly to the ARB to ensure that they were stamped and would not get lost or mishandled within the facility.  Once he had received ARB's response, Plaintiff then submitted the stamped copy to the facility's

---

[7] During his testimony, Plaintiff referred to a letter from the Domestic Relations Division of the Circuit Court of Cook County as evidence of his attempt to obtain a protective order against Defendants.  The letter, which is dated September 27, 2024, states that Plaintiff had improperly submitted his filing with the Domestic Relations Division of the Circuit Court of Cook County and directed him to file his document with the Clerk of the Circuit Court of Cook County.  It is unclear from the record if Plaintiff submitted that request for protective order prior to filing this Complaint, but it appears that he did not make any further attempts to file his request with the proper department.  (Doc. 87; p. 39).

grievance office.  Sometimes, however, he made copies of his original grievance and sent one copy to the ARB simultaneously with filing another copy with the facility's grievance office.  He did not realize that this was not the right process until after he began receiving the ARB's responses directing him to "go through procedure."

On cross-examination, Plaintiff was specifically questioned as to his understanding of ARB's denial letters on two of Plaintiff's grievances.[8]  The ARB denied Plaintiff's grievances because additional information was required, and instructed Plaintiff as follows:

> Provide your original written individual in Custody's Grievance, DOC 0046, including the counselor's response, if applicable.
>
> Provide a copy of the Response to the Individual in Custody's Grievance, Doc 0047, including the Grievance Officer's and Chief Administrative Officer's responses, to facilitate an appeal, if timely.

(Doc. 87, p. 9).    Plaintiff testified that he understood the qualifiers on those sentences ("if applicable" and "if timely") to mean that he did not need to provide those documents if no response had been received yet or if a response was untimely.

On cross-examination, Plaintiff admitted that he did not file any grievances prior to initiating this action regarding his claims against Defendants Bent, Modglin, Robert, Effenger, and Leposky.  He claimed, however, that he was excused from doing so because the administrative remedies were unavailable and because he feared retaliation.

Jeffrey Olson, Correctional Counselor at Menard at all times relevant to the Complaint, testified on Defendants' behalf.  Olson explained that Menard maintains a program called

---

[8] The relevant ARB denial letter related to Grievance dated November 30, 2023, and Grievance dated July 9, 2024.  (Doc. 87, pp. 9 & 15).  While the former grievance relates to Count 3, the latter was filed seven months after the Complaint and does not appear to be relevant to this case.  However, the pre-typed language of those denials was also included on all ARB denial letters that Plaintiff received on his relevant grievances.

"CHAMP" or "Cumulative Counseling Summary," which records an inmate's entire grievance history, including the appeals with the ARB, as well as certain interactions between inmates and their Counselor or Grievance Officer. Olson also testified that based on Plaintiff's Cumulative Counseling Summary, Plaintiff filed three grievances at the facility level during the time that he testified he had paused his grievance activity due to the ongoing harassment and intimidation at the Menard Health Care Unit: Grievance #646-6-23, dated June 22, 2023, and received on June 29, 2023, regarding a disciplinary report that he was issued on June 13, 2022; Emergency Grievance #111-8-23, dated August 2, 2023, and received on August 3, 2023, regarding the June 13, 2023, disciplinary report; and Grievance #278-8-23, dated August 3, 2023, and received on August 10, 2023, regarding safety concerns. (Doc. 79-6, p. 8). Olson further testified that based on the Cumulative Counseling Summary, he toured Plaintiff's housing unit and had interactions with Plaintiff at least three times in October of 2023, and at no time did Plaintiff complain about being harassed or intimidated or about his mail being delayed. On cross-examination, Olson confirmed that during his tour in the housing units, he was always accompanied by security staff.

## Analysis

### *Summary Judgment Standard*

Summary judgment is appropriate only if the moving party can demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Ruffin-Thompkins v. Experian Information Solutions, Inc.*, 422 F.3d 603, 607 (7th Cir. 2005). The moving party bears the initial burden of demonstrating the lack of any genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once a properly supported motion for summary judgment is made, the adverse party "must set forth specific facts showing there is a genuine issue for trial." *Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Estate of Simpson v. Gorbett*, 863 F.3d 740, 745 (7th Cir. 2017) (quoting *Anderson*, 477 U.S. at 248).  In considering a summary judgment motion, the district court views the facts in the light most favorable to and draws all reasonable inferences in favor of the nonmoving party.  *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 735 F.3d 962, 965 (7th Cir. 2013) (citation omitted).  While courts generally may not resolve factual disputes on a motion for summary judgment, when the motion pertains to a prisoner's exhaustion of administrative remedies, "the Seventh Circuit has instructed courts to conduct an evidentiary hearing and resolve contested issues of fact regarding a prisoner's efforts to exhaust."  *Pavey v. Conley*, 544 F.3d 739, 742 (7th Cir. 2008); *Roberts v. Neal, 745 F. 3d 232,* 236 (7th Cir. 2014).[9]

### Exhaustion Requirement

Pursuant to 42 U.S.C. § 1997e(a), prisoners are required to exhaust available administrative remedies prior to filing lawsuits in federal court.  "[A] prisoner who does not properly take each step within the administrative process has failed to exhaust state remedies."  *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002).  "[A] suit filed by a prisoner before administrative remedies have been exhausted must be dismissed; the district court lacks discretion to resolve the claim on the merits, even if the prisoner exhausts intra-prison remedies before judgment."  *Perez v. Wisconsin Dep't of Corr.*, 182 F.3d 532, 535 (7th Cir. 1999).  "[A]ll dismissals under § 1997e(a) should be without prejudice."  *Ford v. Johnson*, 362 F.3d 395, 401 (7th Cir. 2004).

---

[9] While this motion was pending, the Supreme Court decided *Perttu v. Richards*, which partially overruled *Pavey*. 605 U.S. 460, 145 S.Ct. 1793, 222 L.Ed.2d 108 (2025).  *Perttu's* impact on this case is discussed in detail later on.

An inmate in the custody of the IDOC must first submit a written grievance within 60 days after the discovery of the incident, occurrence, or problem to his or her institutional counselor unless certain discrete issues are being grieved. 20 Ill. Admin. Code § 504.810(a). If the complaint is not resolved through a counselor, the grievance is considered by a Grievance Officer who must render a written recommendation to the Chief Administrative Officer — usually the Warden — within two months of receipt, "when reasonably feasible under the circumstances." *Id*. §504.830(e). The CAO then advises the inmate of a decision on the grievance. *Id.*

An inmate may appeal the decision of the Chief Administrative Officer in writing within 30 days to the ARB for a final decision. *Id.* § 504.850(a); *see also Dole v. Chandler*, 438 F.3d 804, 806–07 (7th Cir. 2006). The ARB will submit a written report of its findings and recommendations to the Director, who shall review the same and make a final determination within six months of receipt of the appeal. 20 Ill. Admin. Code § 504.850(d) and (e).

An inmate may request that a grievance be handled as an emergency by forwarding it directly to the Chief Administrative Officer. *Id.* § 504.840. If it is determined that there exists a substantial risk of imminent personal injury or other serious or irreparable harm, the grievance is handled on an emergency basis, which allows for expedited processing of the grievance by responding directly to the offender. *Id.* Inmates may further submit certain types of grievances directly to the ARB, including grievances related to protective custody, psychotropic medication, decisions regarding disciplinary proceedings that were made at a facility other than the facility where the individual in custody is currently assigned, and certain issues relating to facilities other than the inmate's currently assigned facility. *Id.* at § 504.870. Further, to satisfy the requirement of exhaustion of administrative remedies, the grievance must contain factual details regarding each

aspect of the inmate's complaint, including the name of each person who is the subject of or who is otherwise involved in the complaint. *Id.* § 504.810(c).

At the same time, inmates need only exhaust the administrative remedies available to them. *Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006). Prison officials may not utilize the exhaustion process so as to unfairly prejudice inmates, and an administrative remedy will be deemed "'unavailable' if prison employees do not respond to a properly filed grievance or otherwise use affirmative misconduct to prevent a prisoner from exhausting." *Dole*, 438 F.3d at 809 (quoting *Lewis v. Washington,* 300 F.3d 829, 833 (7th Cir. 2002); *Dale v. Lappin,* 376 F.3d 652, 656 (7th Cir. 2004)). The Supreme Court has explained that a grievance system might become unavailable, for instance, when the administrative scheme is "so opaque that it becomes, practically speaking, incapable of use" or "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Ross v. Blake*, 578 U.S. 632, 639–40, 136 S.Ct. 1850, 195 L.Ed.2d 117 (2016). It is the defendant's burden to show "beyond dispute" that the administrative remedies were available. *Ramirez v. Young*, 906 F.3d 530, 533 (7th Cir. 2018).

Further, the Seventh Circuit has recognized that "unavailability extends beyond affirmative misconduct to omissions by prison personnel, particularly failing to inform the prisoner of the grievance process." *Hernandez*, 814 F.3d at 842–43 (citation and internal quotation marks omitted). Inmates are not required "'to divine the availability'" of grievance procedures. *Id.* (quoting *King v. McCarty*, 781 F.3d 889, 896 (7th Cir. 2015), *overruled on other grounds by Henry v. Hulett*, 969 F.3d 769 (7th Cir. 2020)). Rather, it is the prison officials' duty to advise inmates of the grievance process, and if they fail to do so, inmates are excused from complying with the

PLRA's exhaustion requirement. *Id.* (citation omitted) ("The prison cannot shroud the prisoner in a veil of ignorance and then hide behind a failure to exhaust defense to avoid liability").

The Seventh Circuit has cautioned that the unavailability "exception is meant to be narrow." *Wallace v. Baldwin*, 55 F.4th 535, 543 (7th Cir. 2022). Thus, "[m]ere ambiguity might not make the administrative process unavailable" and "the inmate should err on the side of exhaustion" when "the administrative process is susceptible of multiple reasonable interpretations." *Reid v. Balota*, 962 F.3d 325, 329 (7th Cir. 2020) (holding that a two-month period of silence rendered administrative remedies unavailable only because the prisoner had no other reason to believe that anyone was "looking into" his grievance). An inmate's subjective ignorance, misunderstanding, or even reasonable mistake as to the administrative proceedings will not excuse his failure to exhaust the available remedies where a prison has adequately informed the inmate regarding the procedure. *Smallwood v. Williams*, 59 F.4th 306, 314-15 (7th Cir. 2023) (citing *Ross*, 578 U.S. at 644, 136 S.Ct. 1850). Further, the grievance procedures do not need to "be sufficiently 'plain' as to preclude any reasonable mistake or debate with respect to their meaning." *Ross*, 578 U.S. at 644, 136 S.Ct. 1850. Yet, when an inmate's lack of knowledge of the procedure is outside his control because "he has not been informed of the process, whether due to misconduct by prison employees, or because his personal circumstances preclude him from being able to make use of the process," the administrative remedies are deemed unavailable. *Smallwood*, 59 F.4th 306, 315.

## Discussion

Here, there is no dispute that Plaintiff did not fully exhaust any of his grievances prior to initiating this action. What is at issue, however, is whether the administrative remedies were available to Plaintiff. In his briefs and during the hearing, Plaintiff provided several reasons why

the administrative remedies in Menard were unavailable: intimidation and harassment by Defendants and non-parties; Menard's operation of the grievance process as a dead end; and the facility's failure to inform Plaintiff of the grievance process.  The Court will begin its analysis with the latter because it is fatal to Defendants' motion as to some of Plaintiff's claims.

*Failure to Inform Plaintiff of the Grievance Process*

It is well established that Defendants carry the burden to show that Plaintiff was aware of the facility's grievance process.  *See Davis v. Mason*, 881 F.3d 982, 985 (7th Cir. 2018); *Hernandez v. Dart*, 814 F.3d 836, 842 (7th Cir. 2016) ("prison officials must inform the prisoner about the grievance process").  Here, Plaintiff testified that he was never informed of the grievance process in Menard.  He testified that he never received an orientation and was never provided with a copy of the facility's manual or handbook detailing the grievance process.  Defendants did not counter Plaintiff's testimony to that effect at the hearing, and their statement of facts is silent on that issue.  (Doc. 79, pp. 2-4).  Plaintiff further testified that he did not understand the steps, timeline, and details of the grievance process.  The ARB's record supports Plaintiff's lack of understanding of the grievance process:  all eleven grievances that Plaintiff filed with the ARB regarding his presence in Menard were denied on procedural grounds and returned to him without a decision on the merits.  (Doc. 89-2, p. 5).  The denials were due to Plaintiff's failure to adhere to DR504F, either by failing to attach facility responses and/or the original grievance to the appeal submitted to the ARB (Doc. 79-5, pp. 24-26; 18-21; 15-17; 13-14; 3-4; 1-2) or for failing to submit the appeal to the ARB within the required timeframe (Doc. 79-5, pp. 22-23; 11-12; 5-10).

In their motion, Defendants argue that Plaintiff was fully aware of the grievance process at the facility level because he filed several grievances while at Menard.  (Doc. 79, p. 9).  However, all but one of those grievances remained unexhausted due to procedural defects.  (Doc. 79-2, pp.

1-6; Doc. 89-2, p. 5).  Defendants further argue that Plaintiff knew how to navigate all levels of the grievance process because he managed to fully exhaust Grievance #339-1-23.  (*Id.*; Doc. 79-6, pp. 8-9; Doc. 79-5, pp. 35-43).  However, Grievance #339-1-23 grieved a disciplinary report issued to Plaintiff while at Shawnee Correctional Center.  (Doc. 79-5, p. 42).  Per the guidelines, this report fell outside Menard's jurisdiction and was therefore immediately reviewable by the ARB, as indicated in the Counselor's response.  *Id.*; *see also* 20 Ill. Admin. Code § 504.870. Accordingly, Plaintiff's successful exhaustion of Grievance #339-1-23 falls short of showing that Plaintiff was aware of how to navigate the Menard grievance process for grievances that were not immediately reviewable by the ARB.  Thus, Defendants have failed to establish that they advised Plaintiff of the grievance process at Menard.

The Court finds that the facility's failure to adequately advise Plaintiff of the grievance process rendered the administrative remedies unavailable with respect to Count 1 of the Complaint. From the record, it appears that Plaintiff made multiple attempts to exhaust his administrative remedies on that claim but was hampered by procedural obstacles.  Specifically, Plaintiff filed at least four grievances regarding the June 13, 2023, incident: Grievance #646-6-23, dated June 22, 2023 (Doc. 79-5, pp. 5-12, 30-34; Doc. 87, pp. 19-20), Grievance #233-7-23, dated July 6, 2023 (Doc. 79-5, pp. 18-21), Grievance #111-8-23, dated August 2, 2023, (Doc. 79-2, p. 1); and Emergency Grievance #278-8-23, dated August 3, 2023 (Doc. 87, pp. 47, 78-81).  Some of those grievances reached the ARB and were either denied because Plaintiff had not attached the Counselor's and Grievance Officer's responses (*e.g.*, Doc. 79-5, pp. 30-34) or because they were submitted to the ARB more than 30 days after the CAO's decision (*e.g.*, Doc. 79-5, pp. 5-10).

Likewise, Plaintiff filed a grievance directly with the ARB on November 30, 2023, grieving Defendant Bent's interference with Plaintiff's inbound mail at the "North 2 Gallery" in Restrictive

Housing (Count 5 of the Complaint). (Doc. 79-5, pp. 13-14). On the same day, Plaintiff sent

directly to the ARB another grievance, wherein he grieved Defendant J. Smith's placing a mucus-

like substance in his oatmeal (Count 4 of the Complaint). (Doc. 79-5, pp. 15-17). The ARB

received and stamped both grievances on December 21, 2023. (Doc. 79-5, pp. 13-17). The ARB

denied the grievances because Plaintiff had not attached the Counselor's and Grievance Officer's

responses. (Doc. 79-5, pp. 13-17).

It is true that throughout the process, the ARB instructed Plaintiff on how to cure those

deficiencies. For instance, in its response to Grievance #646-6-23, the ARB instructed Plaintiff to

resubmit his grievance with the missing documents "if applicable," and "if timely." (Doc. 79-5,

p. 18). But Plaintiff testified that he understood these qualifiers to mean that he did not need to

provide those documents if no response had been received yet or if a response was untimely. While

an inmate's subjective misunderstanding of those instructions would not typically be excused, this

is not the case with Plaintiff, who was never advised of the grievance process at Menard. Because

Plaintiff did not adequately understand the procedural steps and timeline for exhausting a

grievance at Menard, and Defendants have not carried their burden of proving that the facility took

reasonable steps to inform Plaintiff of those issues, the Court excuses Plaintiff's failure to exhaust

his administrative remedies as to Count 1 against Defendant Lewey, Count 4 against Defendant J.

Smith, and Count 5 against Defendant Bent. *Ramirez*, 906 F.3d at 538 (prisoner's subjective

ignorance about grievance procedures excused when the prison has failed to take "reasonable steps

to inform the inmates about the required procedures.").

Turning to Count 3 against Defendants Bent, Modglin, Robert, Effenger, and Leposky, and

Count 4 against Defendant Mercer, however, the Court finds that the facility's failure to provide

Plaintiff with an orientation and copies of the handbook or manual detailing the grievance process

did not excuse his failure to exhaust his administrative remedies. Plaintiff testified that he was aware he was required to file a grievance and get a stamped copy from the ARB before initiating a civil action, but he did not fully understand the proper timeline and levels of review. Unlike his other claims, however, with respect to his claims against Defendants Bent, Modglin, Robert, Effenger, Leposky, and Mercer, Plaintiff admitted that he did not even attempt to file a grievance and receive a stamped copy from the ARB prior to initiating this action. Yet, he argues he should be excused for his failure to exhaust administrative remedies as to those claims because the grievance process in Menard operated as a "dead end," and because he was afraid to file a grievance between September 16, 2023, and November 13, 2023, due to the alleged assault by Defendants Bent, Modglin, Robert, Effenger, Leposky, and subsequent placement to segregation under allegedly inhuman conditions by Defendant Mercer. The Court will address each of those arguments in order.

*"Dead end" exception*

Plaintiff's argument that the grievance process in Menard operated as a "dead end" is unpersuasive. Plaintiff only relies on Emergency Grievance #K4-1223-1861, dated November 30, 2023, in which he grieved Defendant Smith's cruel and unusual punishment by placing a mucus-like substance in his tray. (Doc. 89, pp. 1-4). The CAO approved the grievance as an emergency on December 4, 2023, and sent it back to the Grievance Officer on the same day. (*Id.*). On February 25, 2025, more than a year later and after Plaintiff had already been transferred to Lawrence, the Menard Grievance Officer responded that Plaintiff had been transferred to another facility and therefore recommended that the grievance be denied as moot. (*Id.*). The CAO concurred. (*Id.*).

While it is true that a facility's failure to respond to an emergency grievance for over a year may render the administrative remedies unavailable, the Court finds that this is not the case with respect to Emergency Grievance #K4-1223-1861.  Plaintiff filed the Complaint on December 29, 2023, less than a month after he submitted Emergency Grievance #K4-1223-1861 at the facility level.   One month is not an unreasonable delay that would render the grievance process unavailable.  *See Reid*, 962 F.3d at 329 (holding that a two-month period of silence rendered administrative remedies unavailable only because the prisoner had no other reason to believe that anyone was "looking into" his grievance).  Accordingly, the Court finds that any delay in the processing of Emergency Grievance #K4-1223-1861 falls short of showing that the grievance process was operating as a "dead end" prior to the filing of the Complaint.

*Intimidation and Harassment*

Plaintiff has also argued that his failure to utilize the grievance process at the facility level was due to intimidation by threats of non-party correctional officers between June and August 2023 at the health care unit, and by Defendants Lewey, Bent, Modglin, Robert, Effenger, and Leposk's excessive force against him in September 2023.  He testified that he resumed filing grievances after the November incident with Defendant J. Smith because he continued to be harassed despite refraining from filing a grievance after the September 2023 incident.  Plaintiff's testimony was contradicted as to the period between June and August 2023, as Defendants pointed to grievances Plaintiff filed at the facility level during the time he argued he was afraid to do so. (*See* Doc. 79-2, pp. 1-2).  However, the record corroborates Plaintiff's testimony that he did not file any grievances between September 2023 and November 14, 2023.  (Doc. 79-2, pp. 1-6).  At about that time, Plaintiff also attempted to get a protective order against Defendants in Randolph County.  (Doc. 58, p. 58).

Plaintiff's argument that the grievance process was unavailable due to intimidation and harassment is perplexing.  Of course, the grievance process is rendered  unavailable "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Ross*, 578 U.S. at 644, 136 S.Ct. 1850.  Under *Pavey*, the Court could make factual determinations on this issue.  While this motion was pending, however, the Supreme Court decided *Perttu v. Richards*, 605 U.S. 460, 145 S.Ct. 1793, 222 L.Ed.2d 108 (2025), which partially overruled *Pavey*.  There, the inmate plaintiff filed a § 1983 action raising, *inter alia*, a First Amendment claim against a correctional officer for violating his right to file grievances.  *Id*. at 464.  The inmate claimed he had "tried to file grievance forms" about the alleged abuse, but the defendant "destroyed them and threatened to kill him if he filed more."  *Id*.  The Supreme Court held that "parties are entitled to a jury trial on PLRA exhaustion when that issue is intertwined with the merits of a claim protected by the Seventh Amendment**."** *Perttu*, 605 U.S. at 479, 145 S.Ct. 1793.

The extent of *Perttu*'s impact on *Pavey* hearings remains unclear.  *See Hawn v. Williams*, No. 9:24-CV-1137 (AJB/TWD), 2025 WL 2424309, at *2 (N.D.N.Y. Aug. 22, 2025);  *see also Murphy v. Bailey*, No. 1:22-CV-01266-JEH-RLH, 2025 WL 2305757, at *10 (C.D. Ill. Aug. 11, 2025) (discussing recent precedent).  The Seventh Circuit has cautioned that before proceeding with a *Pavey* evidentiary hearing, district courts must determine whether the issue of exhaustion is intertwined with the merits.  *Breyley v. Fuchs*, 156 F.4th 845, 849 (7th Cir. 2025).  Some Courts have interpreted *Perttu* narrowly, suggesting that it does not apply unless the complaint raises a First Amendment claim for violation of an inmate's right to file a grievance, while others have adopted a broader reading.  *See Murphy*, No. 1:22-CV-01266-JEH-RLH, 2025 WL 2305757, at *10 (discussing recent precedent but adopting a broader reading of *Perttu*).

This dichotomy also appears in recent case law addressing *Perttu* in excessive force cases. Some courts have found *Perttu* inapplicable when the Plaintiff raises excessive force claims, and the complaint does not allege that the Plaintiff attempted to file grievances related to the claims on the merits, because in those cases "the merits of plaintiff's claims do not depend on common factual issues" with the exhaustion issue. *See, e.g.*, *Hill v. Tisch*, 2025 WL 1871142, at *8 (E.D.N.Y. July 7, 2025) (collecting cases). The District Court for the Central District of Illinois, however, recently adopted a broader approach, holding "that it is sufficient for exhaustion and merits issues to be intertwined when a fact-finder must make a credibility determination regarding the testimony of the plaintiff, a defendant, and the same non-party witnesses." *Murphy*, No. 1:22-CV-01266-JEH-RLH, 2025 WL 2305757, at *14.

In *Murphy*, the plaintiff raised an excessive force claim for alleged harassment by a correctional officer, along with claims for failure to prevent the use of excessive force and provide adequate medical care. *Murphy*, No. 1:22-CV-01266-JEH-RLH, 2025 WL 2305757, at *8. As in this case, Defendants moved for summary judgment on the issue of exhaustion of administrative remedies, and Plaintiff countered that the administrative remedies were rendered unavailable due to "staff obstruction, intimidation, and retaliation" at the facility. *Id.* at *3. The plaintiff there argued that after the assaults that gave rise to the case, "staff refused to provide her grievance forms, prevented her from submitting grievances, and threatened and intimidated her to discourage the filing of complaints, thereby making the grievance process inaccessible." *Id.* After a comprehensive discussion of *Perttu* and recent district court cases, the *Murphy* court found *Perttu* applicable because "the credibility of the testimony of the [p]laintiff, some [d]efendants, and some of the same non-party witnesses [would] be central to both the exhaustion and merits claims, albeit on different issues." *Id.* at 12. For instance, the court explained that for exhaustion purposes the

fact-finder needed to determine "whether to believe the [p]laintiff or some of the [d]efendants regarding the claim that she was prevented from filing grievances related to the events alleged in the [c]omplaint." *Id.* On the merits, on the other hand, "a fact-finder [would] also need to make the same credibility determination regarding some of the same parties and witnesses, even though on these questions, the fact-finder [would] be deciding who to believe regarding questions related to the use of excessive force and medical care. *Id.*

In this District Court, District Judge Dugan, addressing the same issue in *Lipscomb v. Connor*, found *Perttu* inapplicable. No. 24-CV-1760-DWD, 2025 WL 2105864 (S.D. Ill. July 28, 2025). Judge Dugan explained:

> the underlying claims here sound under the Fourth or Eighth Amendments concerning conduct during a strip search by Defendant Connor, whereas Plaintiff's ability to access the grievance process is a distinct issue that Plaintiff experienced in the cellhouse that he presented to his counselors, and that he does not attribute in any way to Defendant Connor. The availability of the grievance process will likely turn on testimony of Plaintiff, and a counselor or grievance personnel. There is no indication any testimony or evidence concerning Defendant Connor's alleged actions would be necessary to resolve the issue of the availability of the grievance process. The Court does not find that resolving issues of this nature will in any way be intertwined with the merits of the Fourth or Eighth Amendment claims.

*Id.* at 4. Unlike the plaintiff in *Lipscomb*, however, Plaintiff here attributed his fear about utilizing the grievance process at the facility level to Defendants' alleged assault on September 16, 2023, which is the subject matter of the excessive force claim in Count 3, and his subsequent placement in watch cell 5-04 under unconstitutional conditions of confinement, which is the subject matter of Count 4 against Defendant Mercer. A finding of harassment and intimidation that hindered Plaintiff's access to the grievance process could necessitate a factual determination regarding the alleged use of excessive force on September 16, 2026, and the conditions of Plaintiff's

confinement in watch cell 5-04 for fourteen days.  Accordingly, Wilson's allegations appear likely to implicate *Perttu*.

In light of these developments, the Court finds it appropriate to **DENY without prejudice** Defendants' motion for summary judgment as to the claims that appear to implicate *Perttu*, and allow those Defendants 30 days to refile their motion, specifically addressing the *Perttu* intertwinement and its impact on the claims against them.  Alternatively, Defendants may move to withdraw the affirmative defense of failure to exhaust as to the claims against them. If Defendants decide to refile the motion, then Plaintiff will have 30 days to respond.  If no motion is filed within the 30-day deadline, the affirmative defense of exhaustion of administrative remedies will be deemed withdrawn.

Accordingly, Defendants' Motion for Summary Judgment (Doc. 79) is **DENIED** with respect to Plaintiff's Eighth Amendment claim against Defendant Lewey for the use of excessive force against Plaintiff on June 13, 2023 (Count 1), Eighth Amendment claim of cruel and unusual punishment against Defendant J. Smith for intentionally contaminating Plaintiff's kosher breakfast tray on November 13, 2023 (Count 4), and his First Amendment claim against Defendant Bent for repeatedly delaying Plaintiff's mail while he was housed in cell 2-44 (Count 5).  Defendant's motion is **DENIED without prejudice** with respect to Plaintiff's Eighth Amendment claim against Defendant Bent, Modglin, Robert, Effenger, and Leposky for the use of excessive force against Plaintiff on September 16, 2023 (Count 3) and with respect to Plaintiff's Eighth Amendment claim of cruel and unusual punishment against Defendant Mercer for intentionally falsifying a mental health form, resulting in Plaintiff being placed in watch cell 5-04 for fourteen days (September 16, 2023, through September 30, 2023) (Count 4).  Defendants are granted leave to refile their motion on those claims by **December 24, 2025**, to show that the resolution of the

issue of exhaustion of administrative remedies does not implicate *Perttu* or to withdraw their affirmative defense of exhaustion of administrative remedies.

**Plaintiff's Motion to Appoint Counsel (Doc. 96)**

Plaintiff filed his fourth motion seeking recruitment of counsel.  (Docs. 21, 29 & 54). While there is no constitutional or statutory right to counsel for a civil litigant, under Section 1915(e), a district court "may request an attorney to represent any person unable to afford counsel." 28 U.S.C. § 1915(e)(1); *see also Stroe v. Immigration and Naturalization Services*, 256 F.3d 498, 500 (7th Cir. 2001).  When presented with a request to appoint counsel, a court must make the following inquiries: (1) has the indigent plaintiff made a reasonable attempt to obtain counsel or effectively been precluded from doing so, and (2) given the difficulty of the case, does the plaintiff appear competent to litigate it himself.  *Pruitt v. Mote*, 503 F.3d 647, 654-55 (7th Cir. 2007).

Plaintiff attached to his first motion for recruitment of counsel four letters from law firms, dated May and June of 2024, denying him representation on this matter.  (Doc. 21, pp. 2-5).  Thus, Plaintiff has carried his burden of showing his effort to obtain counsel on his own.  However, the Court finds that the complexities of this case do not exceed Plaintiff's ability to litigate it on his own.  The undersigned was able to assess Plaintiff's ability to represent himself during the *Pavey* hearing.  Plaintiff provided a clear testimony as to the facts relevant to Defendants' motion, cross-examined Defendants' witness, and adequately presented his legal arguments both in his briefs and in his oral arguments.  Plaintiff was able to survive summary judgment on the issue of exhaustion of administrative remedies by exhibiting a good understanding of the exceptions applicable to the PLRA exhaustion requirement.

Turning to the complexities of his case, while Plaintiff asserts multiple claims against several Defendants, those claims are relatively straightforward and do not involve particularly

complex legal issues.  As to his excessive force claims, Plaintiff will need to show that Defendants used force not in a good-faith effort to maintain or restore discipline, but maliciously and sadistically to cause harm.  *See Hendrickson v. Cooper*, 589 F.3d 887, 890 (7th Cir. 2009).  As to his Eighth Amendment's cruel and unusual punishments claim, Plaintiff will first need to show that the conditions Plaintiff experienced (being placed in watch cell 5-04 for fourteen days, being denied running water, not provided a mattress, and denied food) denied him "the minimal civilized measure of life's necessities," creating an excessive risk to the inmate's health or safety.  *Farmer v. Brennan,* 511 U.S. 825, 834 (1994).  Plaintiff will also have to show that Defendants acted with a culpable state of mind, meaning that they were deliberately indifferent to a substantial risk of serious harm to Plaintiff from those conditions.  *Farmer*, 511 U.S. at 837, 842.  As to Plaintiff's First Amendment claim of repeated occurrences of delaying his mail while he was housed in cell 2-44, Plaintiff will have to show that Defendant Bent "repeatedly and intentionally withheld otherwise unobjectionable materials from ever reaching him." *See Rowe v. Shake*, 196 F.3d 778, 782 (7th Cir. 1999) (citing  *Sizemore v. Williford*, 829 F.2d 608, 610 (7th Cir. 1987)).  The Court is confident, based on Plaintiff's filings and his understanding of the law as demonstrated at the *Pavey* hearing, that the complexities of this case do not exceed his ability to litigate this matter on his own.

Accordingly, Plaintiff's Motion to Appoint Counsel (Doc. 96) is **DENIED without prejudice**.  Plaintiff may renew his motion if there is a change of circumstances in the future.

## Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment on the Issue of Exhaustion of Administrative Remedies (Doc. 79) is **DENIED** with respect to Plaintiff's Eighth Amendment claim against Defendant Lewey for the use of excessive force against Plaintiff on

June 13, 2023 (Count 1), Eighth Amendment claim of cruel and unusual punishment against Defendant J. Smith for intentionally contaminating Plaintiff's kosher breakfast tray on November 13, 2023 (Count 4), and First Amendment claim against Defendant Bent for repeatedly delaying Plaintiff's mail while he was housed in cell 2-44 (Count 5).  Defendants' motion is **DENIED without prejudice** with respect to Plaintiff's Eighth Amendment claim against Defendant Bent, Modglin, Robert, Effenger, and Leposky for the use of excessive force against Plaintiff on September 16, 2023 (Count 3) and with respect to Plaintiff's Eighth Amendment claim of cruel and unusual punishment against Defendant Mercer for intentionally falsifying a mental health form, resulting in Plaintiff being placed in watch cell 5-04 for fourteen days (September 16, 2023, through September 30, 2023) (Count 4).  By **December 24, 2025**, Defendants Bent, Modglin, Robert, Effenger, Leposky, and Mercer shall either renew their motion on those claims addressing *Perttu's* intertwinement issue and its impact on this case or withdraw their affirmative defense of exhaustion of administrative remedies.  Plaintiff's Motion to Appoint Counsel (Doc. 96) is **DENIED without prejudice**.  Plaintiff may renew his motion if there is a change of circumstances in the future.

IT IS SO ORDERED.

DATED: November 24, 2025

s/ *Reona J. Daly*
**Hon. Reona J. Daly**
**United States Magistrate Judge**